**Ebb SPRIGGS, Plaintiff,**

v.

**The CITY OF CHICAGO, a Municipal corporation, et al., Defendants.**

**No. 80 C 5483.**

United States District Court,
N. D. Illinois, E. D.

Aug. 31, 1981.

Richard L. Hirsh, Chicago, Ill., for plaintiff.

Robert T. Karmgard, Asst. City Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Plaintiff Ebb Spriggs seeks damages for injuries allegedly caused by police misconduct. Named as defendants are both the allegedly culpable individual officers and their employer, the City of Chicago. Pursuant to Fed.R.Civ.P. 12(b)(6), the City has moved to dismiss all claims against it. For the following reasons, this motion is denied.

### I. Facts

According to plaintiff's allegations which are taken as true for the purposes of this motion, plaintiff, a black individual, was a victim of gross police brutality. Plaintiff alleges that around 11:30 p. m. on November 30, 1979, numerous armed plain-clothes officers demanded entry to his home on Chicago's west side. The officers, at least some of whom were white, did not identify themselves as policemen. In fear for his life, plaintiff attempted to flee through his rear door. However, he was quickly ap-

prehended and thereupon subjected to a severe beating. Following the attack, the police officers searched plaintiff's home, finding and removing several guns. Plaintiff was then arrested and taken to the police station where he was held for four hours and charged with violating several Chicago ordinances. The States Attorney of Cook County subsequently dismissed all charges.

According to plaintiff, at no time during these events were any arrest or search warrants outstanding and the individual defendants did not have probable cause to believe that he had committed a crime or that his home contained any articles subject to seizure. Plaintiff claims that the acts of the individual defendants deprived him of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments and proximately caused him great injury.

In Count I plaintiff seeks compensatory and punitive damages of $50,000 against the individual officers under both 42 U.S.C. § 1981 and 42 U.S.C. § 1983. In Count II plaintiff alleges that the above-described acts resulted from a conspiracy between the individual defendants and "other persons whose names are presently unknown." Complaint, ¶ 30. The goal of this conspiracy, plaintiff alleges, was the denial to plaintiff of his right to equal protection under the law. An additional $50,000 of compensable relief is accordingly sought from the individual defendants under 42 U.S.C. § 1985.

In Count III plaintiff alleges that "it is the practice and custom of the City of Chicago via its police officers to treat black individuals in the manner and fashion described in this Complaint." Complaint, ¶ 33. Plaintiff's claim of custom is premised on the following theory. Instances of police

brutality against black individuals, he argues, occur often and repeatedly. Further, the City of Chicago is aware of all or most of these events. Yet in the face of this awareness, the City has failed to curb its employees' behavior. More specifically, the City has failed to discharge its "duty" to prevent or discourage said instances from occurring by means of investigation, punishment of the involved officer or other means . . ." Complaint, ¶ 37. Plaintiff demands $50,000 from the City under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

The present motion concerns only Count III. It is thus necessary to discuss only the contours of municipal liability under Sections 1981 and 1983.[1]

## II. *Section 1983*[2]

### A. *Basic Requisites of Municipal Liability.*

▉ It is by now hornbook law that cities are "persons" within the meaning of Section 1983 and can thus be liable for the constitutional torts of their agents. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *overruling on this point, Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). But it is equally clear that the mere fact of agency is an insufficient basis upon which to premise municipal liability; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Rather, municipal liability attaches only when

"the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an

1. The defendant City's Memorandum in Support of the Motion to Dismiss also discussed § 1985. However, as noted above, § 1985 is asserted as a basis for relief only against the individual defendants.

2. Section 1983 provides as follows:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage

of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivation visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels."

*Id.*, 436 U.S. at 690–1, 98 S.Ct. at 2035–36 (footnote and citation omitted). Only when a municipal "policy" is the motivating force behind a constitutional deprivation can it be said that a city has, in the words of the statute, "cause[d plaintiff] to be subjected" to the wrong. *Id.* 436 U.S. at 692, 98 S.Ct. at 2036. Thus, municipal liability under Section 1983 requires proof of two elements. First, it must be shown that the acts of the city's agents were wrongful, i. e., there must be plead a constitutional or statutory (*Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)) violation. Second, plaintiff must establish the existence of a municipal "policy" directing the occurrence of such violation. A *Monell* complaint can thus survive a motion to dismiss only if its averments sufficiently address both prongs of this test.

### B. *Constitutional Deprivation.*

■ As alleged in the complaint, the acts of the individual defendants clearly contravened the Constitution. *See Monroe v. Pape, supra.* This is not to say that plaintiff's invocation of each constitutional amendment listed in the complaint is proper. At this point, for example, the alleged facts do not appear sufficient to sustain a finding of an Eighth Amendment violation. *See Ingraham v. Wright*, 430 U.S. 651, 664–71, 97 S.Ct. 1401, 1408–12, 51 L.Ed.2d 711 (1977). For present purposes, however, it is enough that the allegations evidence *some* constitutional wrong.

### C. *Municipal Policy.*

■ Plaintiff has alleged that it is the policy of the City of Chicago to deprive its black citizens of their civil rights. Plaintiff candidly admits that in all probability no such official policy has been enacted. Memorandum in Opposition to the Motion to Dismiss at 5. Yet *Monell* makes clear that such admission is not fatal. Municipalities are equally liable for *de facto* policies or customs which engender constitutional deprivation. As the Second Circuit has noted, "[t]o require that senior officials must have formally adopted or promulgated a policy before their conduct may be treated as 'official' would for present purposes render *Monell* a nullity, exalting form over substance." *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980).

Yet given this general rule, one might still question whether the alleged form of *de facto* policy—that evidenced by inaction—is a valid basis for Section 1983 liability. In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), plaintiffs sought to hold numerous supervisory officials of the Philadelphia police department liable under Section 1983 for the constitutional torts of their subordinates. Liability was claimed to result from the supervisors' "*failure* to act in the fact of a statistical pattern" of subordinate misconduct. *Id.* at 376, 96 S.Ct. at 606 (emphasis in original). The Supreme Court unambiguously rejected the proferred theory, *id.*, seemingly holding that inaction cannot equal Section 1983 liability. *Id.* at 384–5, 96 S.Ct. at 610 (Blackmun, J., dissenting).

The Court, however, offered an entirely different interpretation a mere two years later in *Monell*. There *Rizzo* was found to stand simply for the proposition "that the mere right to control [subordinates] without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell*, 436 U.S. at 694 n.58, 98 S.Ct. at 2037 (citation omitted). Thus "at least one form of inaction—failure to supervise combined with the exercise of some control—may be actionable." *Mayes v. Elrod*, 470 F.Supp. 1188, 1194 (N.D.Ill.1979); *accord, Redmond v. Baxley*, 475 F.Supp. 1111, 1116

(E.D.Mich.1979).[3] Under *Monell,* in short, it appears that municipal liability can be grounded in either the acts or omissions of policy-making officials. *See, e. g., Turpin, supra,* 619 F.2d at 200–1; *Villa v. Franzen,* 511 F.Supp. 231, 235 (N.D.Ill.1981).

Subsequent decisions have refined this point, indicating that liability attaches only when the inaction evidences an extremely high degree of culpability. The rule in the Second Circuit is that

> "a mere failure by the county to supervise its employees would not be sufficient to hold it liable under § 1983. However, the county could be held liable if the failure to supervise or the lack of a proper training program was so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights."

*Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (citation omitted). More specifically, "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the supervisor's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin, supra,* 619 F.2d at 201; *accord, Popow v. City of Margate,* 476 F.Supp. 1237, 1245–6 (D.N.J.1979); *Leite v. City of Providence,* 463 F.Supp. 585, 590–1 (D.R.I.1978); *The Supreme Court, 1977 Term,* 92 Harv.L. Rev. 57, 322 (1978); *cf. Edmonds v. Dillin,* 485 F.Supp. 722, 727 (N.D.Ohio 1980) (plaintiff must show a complete failure to train or such reckless regard of the need to inform policemen of their duty to obey the Constitution that unconstitutional police action becomes reasonably likely).[4]

■ The clear import of these decisions is that an allegation of mere negligent inaction is insufficient. Municipal liability cannot, in other words, flow from a city's simple failure to exercise due care in responding to past instances of police misconduct. Rather, the alleged breach of duty must be of much greater dimension. *But see Carter v. Carlson,* 447 F.2d 358 (D.C.Cir.1971), *reversed on other grounds sub nom., District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

The Seventh Circuit has yet to address this aspect of the *Monell* doctrine. Nevertheless, the *Owens-Turpin* standard seems appropriate, for holding claims of negligence sufficient is inconsistent with the Supreme Court's basic determination that proof of a culpable policy or custom must be shown. The leading discussion of what constitutes a *de facto* custom or policy for Section 1983 purposes is found in *Adickes v. S. H. Kress and Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There a white plaintiff argued that her civil rights were violated by a private restaurant's refusal to serve her in the company of blacks. The restaurant's refusal, she argued, was a product of a state-enforced custom of racial segregation. In response, the Court held that, to be actionable, a " 'custom or usage'

---

**3.** In the area of Eighth Amendment law, the Supreme Court has itself noted that one particularly gross form of inaction—that which evidences "deliberate indifference" to the serious medical needs of prison inmates—gives rise to Section 1983 claims. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This holding might, however, be based simply upon a theory that prison officials labor under greater affirmative duties to act than do other state officials given that inmates have no choice but to turn to prison officials for basic necessities. *See Smith v. Ambrogio,* 456 F.Supp. 1130, 1135 n.4 (D.Conn.1978).

**4.** There has been little debate in the cases thus far over the proposition that a gross failure to respond to a pattern of unconstitutional behavior is actionable. Where courts have differed has been over whether a municipal policy can be shown in the absence of such a pattern. *Compare Turpin, supra,* 619 F.2d at 202; *Owens, supra,* 601 F.2d at 1246; *Leite, supra,* 463 F.Supp. at 590–1 *with Hamrick v. Lewis,* 515 F.Supp. 983, at 986 (N.D.Ill.1981); *Gomez v. City of West Chicago,* 506 F.Supp. 1241, 1245 (N.D.Ill.1981); *Magayanes v. City of Chicago,* 496 F.Supp. 812, 814 (N.D.Ill.1980); *Popow,* 476 F.Supp. at 1246. In view of the fact that plaintiff in this case alleges a failure to respond to past violations, this court need not enter this debate.

must have the force of law by virtue of the persistent practices of state officials." What must be shown are "settled practices of state officials [which] may, by imposing sanctions or withholding benefits, transform private predilections into compulsory rules of behavior ..." *Id.* at 167–8, 90 S.Ct. at 1613. By invoking the phrases "force of law" and "compulsory rules of behavior," the Court made clear that a *de facto* policy or custom exists only when it is highly probable that future behavior will conform to the state's informal command. It is for this reason that allegations of mere negligence are inadequate. For a city's action can be deemed negligent whenever its policy making officials needlessly increase the risk of plaintiff's injury. Thus, even if a city's failure to respond to a given pattern of police misconduct increases the risk of additional future misconduct only slightly, the city may still be negligent if the cost of such marginal behavior outweighs the cost of taking remedial action. *See* Restatement (Second) of Torts § 291. A city, in other words, can be negligent even if its acts or omissions have not rendered the undesirable behavior substantially more likely to occur. Holding a city liable under such circumstances is thus contrary to the teachings of *Monell* and *Addickes*.[5]

■ What are needed instead are averments that municipal inaction has been reckless, defined here to mean inaction which has created a substantial probability that undesirable subordinate behavior will manifest itself in increased and significant amounts. *See generally Little v. Walker,* 552 F.2d 193, 197 n.8 (7th Cir. 1977). Accordingly, plaintiff's allegations are sufficient only if they can be read to assert that the City's failure to respond to past instances of police misconduct *vis-a-vis* blacks evidences not merely negligence on the part of the City, but, in the very least, reckless disregard of the right of blacks to be free from the injuries[6] suffered by plaintiff.

5. This result is not inconsistent with the Supreme Court's recent decision in *Parratt v. Taylor,* —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). There the Court held that a deprivation of property is a constitutional deprivation within the meaning of the Fourteenth Amendment even when it proximately results only from the simple negligence of a supervisory state actor. Nevertheless, since the possibility of a post-deprivation tort award provided the plaintiff with all the process he was due, the Court further held that there had been no deprivation "without due process of law." On the basis of *Parratt,* Spriggs might thus argue that municipal negligence is actionable unless such negligence is redressable under Illinois tort law. However, it is not yet clear whether the *Parratt* approach has application beyond the realm of property deprivations. *Compare id.,* 101 S.Ct. at 1918 (Blackmun, J., concurring) *with Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). And, in any case, Spriggs could, on the facts he has alleged, recover from the city in state court. See *Lamonte v. City of Belleville,* 41 Ill.App.3d 697, 355 N.E.2d 70 (5th Dist. 1976) (municipality liable on *respondeat superior* grounds for a policeman's battery); *Newell v. City of Elgin,* 34 Ill.App.3d 719, 340 N.E.2d 344 (2d Dist. 1976) (municipality liable on *respondeat superior* grounds for a policeman's illegal search and false arrest). That these recoveries would be based on the individual defendants' intentional torts, and not on the city's own negligent supervision, is irrelevant. What is relevant is that Illinois law offers Spriggs the possibility of full compensation for his injuries. This is all the *Parratt* conception of due process demands. *Parratt,* 101 S.Ct. at 1917. Mere municipal negligence is therefore not enough.

6. Some stress must be placed on the term "the injuries." A plaintiff who has suffered tort A generally cannot adequately assert the existence of a motivating municipal policy by alleging prior acquiescence in a pattern of incidents involving tort B. *See generally Bell v. City of Philadelphia,* 511 F.Supp. 1156, 1165–6 (E.D.Pa. 1981). Municipal defendants should not, however, be allowed to escape liability simply by pointing out non-material differences between A and B. Thus, liability may still attach if the torts are so similar that reckless condonation of B derivatively implies reckless disregard of the possibility of A's occurrence. Tort B might, moreover, be so offensive that its reckless condonation might in turn imply reckless disregard of the possibility that subordinates will view such condonation as a declaration of "open season" on *all* of plaintiff's rights, thereby inducing the occurrence of the "lesser" tort A. This latter exception appears to be applicable to the case at bar. Strictly speaking, Spriggs has alleged acquiescence only in prior acts of violence. *See* page 144, *infra.* Under the general rule stated above such allegations do not adequately assert the existence of a policy directing the occurrence of the other torts—*e. g.,* wrongful search and seizure—allegedly committed. Yet recklessness toward racial vi-

■ The relevant paragraphs of the complaint are as follows:

"33. That it is the practice and custom of the City of Chicago via its police officers to treat black individuals in the manner and fashion described in ... this Complaint....

"35. That instances of violence against black individuals by Chicago Police Officers occur with regularity and frequency and the City of Chicago is aware of all or most of said instances.

"36. That it is the practice and custom of the City of Chicago to fail to act in any positive manner to prevent or discourage the conduct by its employees such as are described herein.

"37. That the City of Chicago has a duty to prevent or discourage said instances from occurring by means of investigation, punishment or other means and that the City of Chicago has failed and neglected to fulfill said duty ...."

Nowhere does plaintiff claim *in haec verba* that the City has acted recklessly. Such failure, however, is not fatal, for it is possible to view in the allegations a charge that the pattern of past violations has been so pervasive that City inaction can only be deemed reckless. Surely the command of Rule 8(f) of the F.R.Civ.P. compels no less lenience, particularly in view of the harshness that would otherwise be visited on plaintiff for counsel's mere failure to invoke a "buzzword" only now announced.

Some courts, however, would nevertheless find the present pleadings inadequate. Judge Newman, for one, has argued that "[a]t a minimum the pleader must specify the overt acts relied upon as a basis for the claim that a pattern of unconstitutional actions exists and that the senior officials of the town knew of the unconstitutional actions and encouraged their repetition by inaction ....

"A claim of this sort should not be initiated unless there is a sufficient factual basis to justify the extensive litigation that such a claim entails. The typical § 1983 suit against a police officer for his allegedly unconstitutional action generally involves a single episode. Discovery and trial are entirely manageable. But a claim of municipal liability based on an alleged policy reflected by a pattern of prior episodes will inevitably risk placing an entire police department on trial. Sweeping discovery will be sought to unearth episodes in which allegedly similar unconstitutional actions have been taken, and the trial will then require litigation of every episode occurring in the community that counsel believes can be shown to involve a similar constitutional violation.... [N]either a federal court nor a municipality should be burdened with such an action unless a detailed pleading is presented."

*Smith v. Ambrogio*, 456 F.Supp. 1130, 1137 (D.Conn.1978). Specifically, Judge Newman complained of the *Smith* plaintiff's failure to detail, *inter alia*, "the identity ... of the agents whose actions are deemed to reflect the policy of the Town" and the "specific episodes" of prior misconduct. *Id.; see generally Schramm v. Krischell*, 84 F.R.D. 294 (D.Conn.1979); *Penzerro v. Marchionni*, Civil No. B–77–387 (D.Conn. Apr. 18, 1979); *Schweiker v. Gordon*, 442 F.Supp. 1134, 1139–41 (E.D.Pa.1977). Plaintiff's allegations in this case suffer from identical infirmities.

Notwithstanding the substantiality of Judge Newman's concerns, the Seventh Circuit has apparently rejected the logic of *Smith*. In *Murray v. City of Chicago*, 634 F.2d 365 (7th Cir. 1980), plaintiff sought to establish the existence of a municipal policy on the basis of past acquiescence in prior misconduct. An examination of the actual complaint reveals that no details of either the past acquiescence or the prior incidents of misconduct were pleaded; in fact, the allegations were, if anything, even more conclusory than those at bar. The district court, relying on *Monell*, dismissed the ac-

olence very probably subsumes—via the reasoning outlined above—recklessness towards "lesser" injustices against blacks, such as the

violation of their privacy rights. In the very least, such an inference should not be discounted at this stage of the proceedings.

tion as against the City. The Court of Appeals, however, reversed, holding that "as to the city, it is possible that existence of a policy, custom, or practice might be established. If plaintiff succeeds in proving her allegation that similar unwarranted arrests have occurred frequently, to the knowledge of the parties involved, it might be possible to show dereliction of constitutional dimension upon the part of the responsible officials."

*Id.*, 634 F.2d at 367 (footnote omitted). A *Monell* complaint is thus apparently sufficient in this Circuit so long as the plaintiff pleads the skeletal outlines of a viable theory of municipal culpability. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hamrick v. Lewis*, 515 F.Supp. 983 at 986 n.4 (N.D.Ill.1981); *Magayanes v. City of Chicago*, 496 F.Supp. 812, 814 (N.D.Ill. 1980). Judged by this standard, plaintiff's complaint adequately pleads the existence of a municipal policy directing the occurrence of the injuries he suffered.[7]

---

7. Judge Shadur, the author of *Magayanes*, has apparently adopted an even more relaxed standard in the interim. In *Villa v. Frank*, 511 F.Supp. 231, 235 (N.D.Ill.1981) and *Thompson v. Village of Evergreen Park, Ill.*, 503 F.Supp. 251, 252 (N.D.Ill.1980), Judge Shadur rejected motions to dismiss complaints which simply made the boldface assertion that a culpable municipal policy or custom existed. *Contra, Hamrick, supra.* In view of the fact that in this case the plaintiff gives at least some indication of how he intends to make out a showing of "policy," there is no need here to decide whether the court agrees with Judge Shadur's more liberal pleading standard.

8. Section 1981 provides as follows:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

9. One point, however, is clear. That is that municipalities are not entitled to an absolute immunity; they are, in other words, proper defendants under the statute. *United States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir.), *cert. denied sub nom., Arado v. United States*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155

## III. *Section 1981*[8]

Neither the Supreme Court nor the Seventh Circuit has yet set forth the rules governing municipal liability under Section 1981.[9] It is possible that the provision will eventually be construed *in pari materia* with Section 1983. The *Monell* requirement of a motivating policy may, in other words, be incorporated into the statute. *But cf. District of Columbia v. Carter*, 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973) (different civil rights statutes should not necessarily be construed identically); *Garner v. Giarrusso*, 571 F.2d 1330, 1340 (5th Cir. 1978) (significant differences exist between Sections 1981 and 1983); *United States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir.), *cert. denied sub nom., Arado v. United States*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (same). Conversely, the Third Circuit's determination that Section 1981 encompasses municipal *respondeat superior* liability[10] may be

---

(1977). To be sure, this case does not mirror the *City of Chicago* litigation. There the plaintiffs sought but declaratory and injunctive relief, whereas plaintiff Spriggs here seeks damages. This distinction, however, should be disregarded. Nowhere in the text of Section 1981 is there language suggesting the appropriateness of a bifurcated approach under which a particular defendant can be liable for equitable, but not legal, relief. *Cf. City of Kenosha, Wisconsin v. Bruno*, 412 U.S. 507, 513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (1973) (nothing suggests "that the generic term 'person' in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them.") Moreover, at least four other circuit courts have held that damages are recoverable from municipalities in § 1981 suits. *See Des Vergnes v. Seekonik Water Dist.*, 601 F.2d 9, 15 (1st Cir. 1979); *Garner v. Giarrusso*, 571 F.2d 1330, 1338–41 (5th Cir. 1978); *Mahone v. Waddle*, 564 F.2d 1018, 1030–7 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Sethy v. Alameda County Water District*, 545 F.2d 1157, 1160 (9th Cir. 1976) (en banc).

10. The Seventh Circuit has ruled that *private* employers can be held liable under Section 1981 on *respondeat superior* grounds. *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977). However, given the significant constitutional problems the Reconstruction

adopted.[11] See *Mahone v. Waddle*, 564 F.2d 1018, 1030–7 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). Given the present pleadings, however, it is unnecessary to resolve this question of statutory interpretation. For even if plaintiff is held to the more stringent *Monell*-like standard, his allegations sufficiently aver the existence of both a policy directing the occurrence of his injuries and discriminatory intent in the formulation of such policy. (I also note that the plaintiff did not plead *respondeat superior* as a basis for his § 1981 claim.)

█ The only real question here is whether Section 1981 renders illegal the acts which allegedly grew out of the policy's enactment. Does Section 1981, in other words, make actionable in federal court the illegal beating, arrest, search and seizure—events plaintiff claims "were motivated by . . . racial prejudice," Complaint, ¶ 34—inflicted on the plaintiff? The Third Circuit's answer is clear. Section 1981, in that Court's view, prohibits all instances of "racially motivated misuse of governmental power." *Hall v. Pennsylvania State Police*, 570 F.2d 86, 91 (3d Cir. 1978). Indeed, the Third Circuit has specifically held that allegations very similar to those in this case are sufficient to plead a statutory violation. *Mahone v. Waddle*, 564 F.2d at 1027–30; *accord, Jones v. City of Philadelphia*, 491 F.Supp. 284 (E.D.Pa.1980); *Croswell v. O'Hara*, 443 F.Supp. 895, 897 (E.D.Pa.1978); *Milburn v. Girard*, 441 F.Supp. 184, 188 (E.D.Pa.1977).

The City nevertheless argues that Section 1981 applies only to allegations that blacks have been denied the right to contract on equal terms with whites. The strongest support for this proposition is found in the Supreme Court's casual observation that "Title 42 U.S.C. § 1981, . . . on its face, relates primarily to racial discrimination in the making and enforcement of contracts." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1976). Yet, even here, the use of the adjective "primarily" clearly indicates that the Court did not intend to restrict Section 1981 solely to the realm of contracts. Such a cramped reading of the statute is, moreover, barred by *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). There the Court held that R.S. § 1977, an identically worded predecessor to § 1981, guarantees to blacks the right to be tried before a jury which has been selected in a racially nondiscriminatory manner. This holding simply cannot be squared with a "contracts only" interpretation.

The City's claim that its argument is supported by a "cursory reading" of Section 1981 is quite frankly incredible. For the statutory words speak not only of contracting rights, but also of the right to sue, the right to be a party, the right to give evidence, the right "to the full and equal benefit of all laws and proceedings for the security of persons and property . . . ," and the right to be free from unequal "punishment, pains, penalties, taxes, licenses, and extractions of every kind . . . ." To accept the City's argument, one must reduce the bulk of the statute to "meaningless phraseology." *Raffety v. Prince George's Cty.*, 423 F.Supp. 1045, 1062 (D.Md.1976). It should go without saying that construction by deletion is not favored.

Congress—the Congress which authored Section 1981—saw lurking in federal acts imposing vicarious municipal liability, *see generally Monell*, 436 U.S. at 692 n.57, 98 S.Ct. at 2036, the *Crouch-Walker* holding should not be mechanically extended to cases in which the defendant is a municipal corporation. In the court's view, the propriety of such an extension remains an open question in this circuit. For an argument that *Crouch-Walker* should govern the present case, see Comment, *Developments in the Law—Section 1981*, 15 Harv.C.R.–C.L.L.Rev. 29, 206, 208 (1980).

11. The *Mahone* decision was rendered prior to *Monell*, prompting one Third Circuit District Court to question the former's continuing vitality. *See Jones v. City of Philadelphia*, 491 F.Supp. 284, 288 n.5 (E.D.Pa.1980). The *Jones* Court, however, eventually resolved its doubts by holding that municipal *respondeat superior* liability remains proper in § 1981 litigation. *Accord, Com. of Pa. v. Local U. 542, Intern. U.*, 469 F.Supp. 329, 411 (E.D.Pa.1978); *Preston v. City of York*, 452 F.Supp. 52, 54 (M.D.Pa.1978); *Croswell v. O'Hara*, 443 F.Supp. 895, 898 (E.D. Pa.1978).

Most importantly, the plaintiff's allegations fit comfortably within the statute's literal boundaries. Here a black citizen claims that, because of his color, he has suffered an illegal beating, arrest, search and seizure. Viewed as a totality these charges amount to a claim that the plaintiff has been subjected to "punishment, pains, [and] penalties" greater than those to which white individuals must answer. *Mahone v. Waddle, supra*, 564 F.2d at 1028. Furthermore, "[t]he necessary counterpart of the right to be free of racially discriminatory investigation, harassment, and brutality is the right to receive police protection without discrimination." Comment, *Developments in the Law—Section 1981*, 15 Harv.C. R.-C.L.L.Rev. 29, 133 (footnote omitted). Therefore, to the extent that the plaintiff was denied this latter right, he was similarly denied his Section 1981 "right . . . to the . . . full and equal benefit of all laws and proceedings for the security of persons . . ." *Id.* Warrantless, racially-motivated arrests and searches, when made in the absence of probable cause, also fall within the literal reach of the "equal benefit" clause. *Mahone v. Waddle, supra*, 564 F.2d at 1028 (arrests).

The legislative history of Section 1981 supports this broad reading. As the *Mahone* Court noted,

> "The Act was not intended to have merely limited effect; rather, it was to eradicate *all* discrimination against blacks and to secure them full freedom and equality in civil rights. The broad sweep and power of the Act were recognized by the bill's opponents: one warned balefully that the Act would bestow upon the freed

slaves all the rights of free citizens. In vetoing the bill (the veto was later overridden), President Johnson expressed the fear that the bill would prohibit states from exercising *any* power of discrimination between the different races. Congress thus believed that the Civil Rights Act of 1866 would prohibit all racial discrimination."

*Id.*, 564 at 1028–9 (footnotes omitted) (emphasis in original); *see also District of Columbia v. Carter*, 409 U.S. 418, 422, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 427–8 & n.40, 88 S.Ct. 2186, 2197 & n.40, 20 L.Ed.2d 1189 (1968).[12] Given this historical backdrop, it seems reasonable to construe Section 1981 so as to reach the events of November 30, 1979 described in the complaint. And, as noted before, if plaintiff can prove up his further allegations of a racist, culpable, municipal policy, the responsibility and liability for these tragic acts will rest firmly with the City of Chicago.

## IV. *Conclusion*

Proof of plaintiff's allegations will furnish the necessary predicates for holding the City liable under either a Section 1981 or Section 1983 theory.[13] Plaintiff's averments being thus sufficient, the City's motion to dismiss Count III is denied.

---

**12.** In both *Carter* and *Alfred H. Mayer* the Supreme Court dealt with 42 U.S.C. § 1982. The broad construction given that statute by these decisions is, however, relevant to an analysis of § 1981: "Both present Sections 1981 and 1982 were originally part of Section 1 of the 1866 Act, but were broken into two Sections in the 1870 reenactment. Thus they are not to be construed differently." *Baker v. F & F Investment Company*, 489 F.2d 829, 833 (7th Cir. 1973) (citations omitted); *accord, Tillman v. Wheaton-Haven Recreation Ass'n., Inc.*, 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973).

**13.** The City's argument that "42 U.S.C. is the exclusive remedy for alleged constitutional violations by municipalities," Memorandum in Support of the Motion to Dismiss at 3, seems to reflect a belief that plaintiff has alleged a third theory of liability, one based on a cause of action implied directly from the Fourteenth Amendment. *See generally Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The court, however, does not read the complaint as raising this theory.